UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FABRICATED WALL SYSTEMS, INC.,
    Plaintiff,

v.

HERMAN MILLER, INC.,
SCA WALLS, INC., and
ENVIRONMICS, INC.,
    Defendants.

No. 3:08-cv-01313 (SRU)

# MEMORANDUM OF DECISION

Fabricated Wall Systems, Inc. ("FWS"), a Connecticut corporation, brought this action against defendants SCA Walls, Inc. ("Walls"), a Texas corporation, and Environamics, Inc. ("ENV"), a North Carolina corporation, alleging breach of contract.[1] A bifurcated bench trial was held from October 25, 2011 through October 26, 2011. At the close of plaintiff's liability case, defendants made an oral motion for judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure, which allows the court to enter judgment as a matter of law in the moving party's favor at any point in the proceedings when the non-moving party has been fully heard on an issue during a non-jury trial and the court finds against the party. Fed. R. Civ. P. 52(c); *AmBase Corp. v. SDG Inc.*, 2005 WL 1860260, at *2 (D. Conn. Aug. 3, 2005).

"A Rule 52(c) motion made by a defendant may be granted 'where the plaintiff has failed

---

[1] FWS initially commenced this lawsuit on July 31, 2008 against Walls, ENV, and Herman Miller, Inc. ("HMI"), a Michigan Corporation, in Hartford Superior Court (doc. # 1). The defendants subsequently removed the case to this court on August 28, 2008 pursuant to 28 U.S.C. § 1332(a)(1). On October 27, 2008, FWS filed an amended complaint alleging four causes of action: breach of the Connecticut Franchise Act (Count I), breach of contract (Count II), tortious interference with business relations (Count III), and violation of the Connecticut Unfair Trade Practice Act (Count IV) (doc. # 26). FWS voluntarily dismissed HMI as a defendant on December 29, 2008 (docs. # 43 & # 44). On January 10, 2011, this court granted summary judgment in favor of the remaining defendants Walls and ENV on Counts I, III, and IV, leaving only Count II, the breach of contract claim, for trial (doc. # 68).

to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim.'" *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004) (quoting *Stokes v. Perry*, 1997 WL 782131, at *9 (S.D.N.Y. Dec. 19, 1997)). The court's task on such a motion is "to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies. . . . Rule 52(c) implies the same inquiry the Court makes to resolve all of the legal and factual matters under Rule 52(a)." *Id.*

Three witnesses testified at trial: Scott Gillette, the current owner of FWS; Chris Weiss, the former president of EVN; and William Griftner, the former president of Walls. Having considered their testimony as well as all of the documentary evidence, I find that the plaintiff has failed to make out a breach of contract claim by the preponderance of the evidence. Therefore, defendants' motion is GRANTED and judgment is entered in defendants' favor.

The following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a).

**I.     Findings of Fact**

FWS, Walls, and EVN were all in the business of fabricating and installing Herman Miller brand movable wall products, which are typically used in offices and commercial spaces. HMI designed and developed the product line of full height, relocatable wall systems, and a nationwide network of HMI dealers (including those owned by HMI and others that were independently owned and operated) marketed the movable walls to end users such as design firms, general contractors and building owners. In order to facilitate its wall systems business, HMI entered into a Marketing Alliance Agreement ("MAA") with a company called Service

Center Associates, Inc. ("Service Center")[2] in April 1999. Def.'s Ex. A. Under the MAA, Service Center was granted a license by HMI to use trademarks "V-Wall," and "E-Wall" in connection with wall products that were to be manufactured and sold in accordance with the agreement. *Id.* at 1. Pursuant to section 1.4 of the MAA, Service Center had the power, subject to HMI's approval, to sublicense to individual Regional Wall Service Centers ("RWSCs") the right to use HMI's marks as well as all data, drawings and designs required for the manufacture and sale of HMI's wall products. *Id.* at 2. In operation, that meant that when HMI or an HMI dealer requested the fabrication and installation of a relocatable wall for a consumer, Service Center would assign the work of fabricating and installing the relocatable walls to the RWSCs, each of which was responsible for covering a particular region of the country. In exchange for the license, Service Center paid HMI a license fee, namely, a percentage on each sale of HMI relocatable walls facilitated by Service Center and its sub-licensees. *Id*. at 7.

Service Center was required to maintain a network of these RWSCs to price, fabricate, and install HMI wall products according to consumers' specifications as relayed by HMI dealers. *Id*. at 2. On the effective date of the MAA, there were six RWSCs operating in six designated trading areas, including FWS and EVN.[3] *Id.* at 14 (Exhibit B). Those provisions of the MAA, however, do not establish that the sublicensed RWSCs had an *exclusive* right to manufacture, install, or sell HMI relocatable wall systems within their designated regions. Finally, the MAA had a fixed term and expired on June 3, 2002. *Id.* at 7.

On June 1, 1999, FWS, acting through its previous owner, Richard Wood, executed a

---

[2] Service Center is not a party to this action and has been dissolved. Service Center should not be confused with defendant "SCA Walls, Inc." Walls is a separate and distinct entity that is not a corporate successor to Service Center.
[3] When the MAA was originally executed in 1999, defendant Walls was not yet in existence.

Regional Wall Service Center Agreement ("RWSC Agreement") with Service Center memorializing FWS's rights and obligations as an RWSC. Pl.'s Ex. 5. Section 1.1 of the RWSC Agreement purported to grant FWS "an exclusive sublicense" to use HMI product trademarks and to sell HMI products within a trading area consisting of states in the mid-Atlantic and Northeast region.[4] *Id.* at 1, 10 (Exhibit 1). Further, section 2.3 of the RWSC Agreement stated that "[a]ll product orders placed by authorized dealers or end users within the trading area shall be through [FWS]," and section 2.4 provided that, if an authorized dealer placed an order in an FWS trading area directly with Service Center, Service Center would forward the order to FWS promptly. *Id.* at 2. Lastly, sections 9.1 and 9.4 provided that Service Center could terminate the contract if FWS failed to perform the required services, but only after giving thirty days' written notice stating the nature of default and affording FWS an opportunity to cure. *Id.* at 5-6. FWS paid sublicense fees directly to Service Center based on a percentage of its sales, and Service Center forwarded those fees to HMI pursuant to the MAA. *Id.* at 4. The RWSC Agreement expired by its own terms on June 3, 2002, and included a provision stating that all modifications must be in a writing signed by the parties. *Id.* at 5, 7. Notably, neither Walls nor EVN was a party to the RWSC Agreement.

In September 2001, while the RWSC Agreement was still in effect, Richard Wood sold FWS to its current owner, Scott Gillette. Gillette testified at trial that when he purchased FWS, he believed he had purchased a company that, by virtue of the RWSC Agreement, had an exclusive trading area in which no other HMI regional wall service centers, including the defendants, would be allowed to do business. However, Gillette's assumptions are contradicted

---

[4] Exhibit 1 of the RWSC Agreement defines FWS's trading area as consisting of the following states: Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, Washington D.C. (milcare only),

by other evidence in the record, most notably by testimony from the two individuals who executed the RWSC Agreement itself. William Griftner, who executed the agreement on behalf of Service Center, testified at trial that he did not understand the RWSC Agreement to confer an exclusive territory to FWS in which no other RWSCs could operate. Further, Richard Wood, the former owner of FWS who executed the agreement on its behalf, similarly stated through deposition testimony admitted at trial that he never considered the trading territories to be exclusive per se. Ct. Ex. 502, Dep. of Richard Wood, at 32. Moreover, evidence produced at trial showed that FWS itself did business outside of its assigned trading area on multiple occasions, both before and after its sale to Gillette in 2001. *See* Pl.'s Ex. 48 (listing installation jobs performed by FWS in states outside of its assigned territory, including Virginia, Colorado, and Washington, D.C.).

Both the MAA and the RWSC Agreement expired in 2002. However, the MAA — but, importantly, *not* the RWSC Agreement — was modified in writing three times following its expiration in June 2002. First, on March 6, 2003, the MAA was modified to substitute the defendants, Walls and EVN, for Service Center. Pl.'s Ex. 2, at 1. In other words, Walls and EVN took over Service Center's role as the liaison between HMI and the other RWSCs, and were granted jointly the general license to use and sell HMI relocatable wall products, as well as the right to issue sublicenses to RWSCs. *See id.* The modification also extended the MAA through June 3, 2004. *Id.* Gillette testified that, after Walls and EVN took over Service Center's role, "the parties" continued to conduct themselves much as before the substitution, at least to the extent that FWS paid license fees—now to Walls and EVN, rather than to Service Center—in exchange for the right to use and sell HMI's products.

---

Northern Virginia (milcare only) and Bermuda. Pl.'s Ex. 5, at 10 (Exhibit 1).

Next, the MAA was modified on October 25, 2005, effective as of June 3, 2004. Pl.'s Ex. 3, at 1-2. In relevant part, that modification eliminated an expiration date for the agreement and, in its place, established that the MAA as amended would be effective until HMI, Walls, or EVN cancelled it in writing, with or without cause. *Id.* at 2. Lastly, the MAA was modified on April 17, 2007, changing the geographic trading region in which FWS was authorized to use HMI's trademarks. Pl.'s Ex. 4, at 2 (Exhibit B). Essentially, the modification removed the mid-Atlantic states that had been in FWS's purview and assigned them to EVN, leaving FWS with only Northeastern states.[5] *Id.* All three of the MMA modifications were agreed to by HMI, Walls, and EVN. FWS was never a party to the MAA or any of the subsequent amendments. Notably, although the MAA was modified several times, the RWSC Agreement was never modified in writing.

I now turn to the facts that gave rise to this controversy. Evidence produced at trial showed that FWS's business began to suffer under Gillette's tenure. *See, e.g.*, Pl.'s Ex. 18 (email from Chris Weiss discussing FWS's poor customer relations); Pl.'s Ex. 26 (email exchange between Bill Griftner, Chris Weiss, and Scott Gillette regarding FWS's backlog and poor business performance); Def.'s Ex. BB (email from Peter Philips regarding dealers' complaints about FWS under Gillette's leadership); Def.'s Ex. KK (email from Bill Griftner regarding dealers' "total lack of confidence" in FWS); Def.'s Ex. XX (email from Chris Weiss relaying customer complaints about FWS). As customers and dealers complained about FWS's poor performance, they began to approach the defendants to place orders within FWS's coverage area. Weiss and Griftner testified that Walls and EVN at first tried to assist FWS in supplying

---

[5] Under the April 17, 2007 modification, FWS was assigned only Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, and Vermont. Pl.'s Ex. 4, at 2 (Exhibit B).

that demand. When those efforts failed, however, Walls and EVN proceeded to handle the manufacturing and installation of HMI products for some dealers and customers in FWS's region. Gillette complained, for example, that in October 2006 he discovered that an HMI dealer located in FWS's Maryland territory had placed an order with EVN, which EVN did not forward to FWS. Weiss and Griftner contended that the defendants were permitted to service customers in FWS's territory because there was nothing in the MAA that forbade them from doing so, and because no RWSC had an exclusive right to business within its geographic region. Both Weiss and Griftner testified credibly that, although RWSCs often contacted their respective counterparts in other regions as a matter of courtesy before accepting business from a dealer outside their assigned territory, no single RWSC possessed a contractual right to business within its region to the exclusion of others. Thus, the encroachment about which Gillette complained was considered by the defendants to be preferable to FWS losing business for HMI.

On April 17, 2007, as described above, Walls, EVN, and HMI agreed to cut FWS's geographic territory in a written modification to the MAA. This decrease in the size of FWS's trading area was prompted by repeated complaints regarding FWS's business performance. *See, e.g.*, Pl.'s Ex. 18 (email from Chris Weiss discussing FWS's poor customer relations); Pl's. Ex. 25 (chain of emails between Bill Griftner, Chris Weiss, Peter Philips and Scott Gillette discussing FWS's poor performance); Def.'s Ex. Y (email from Chris Weiss describing the proposed changes to the geographic distribution between Walls, EVN, and FWS). On July 16, 2008, Walls, EVN, and HMI agreed to terminate FWS's business relationship with HMI and its licensees. *See* Pl.'s Ex. 38-39. That day, Chris Weiss, EVN's head, sent a letter to FWS that "any and all Relocatable Walls Marketing Alliance Agreements, whether real or implied," that FWS had entered with Walls, EVN, or HMI were cancelled. Pl.'s Ex. 49. That letter, however,

cited as authority for its cancellation the amended MAA, which permitted cancellation within sixty days of written notice by any party, regardless of cause. *Id.* The letter did not cite the original RWSC Agreement to which FWS had been a signatory. Having lost its sublicense to manufacture and install HMI products, FWS closed its doors in September 2008.

## II. Conclusions of Law

FWS claims that the actions taken by defendants Walls and EVN in 2003 through 2008 constituted breach of contract and ultimately caused FWS's demise. FWS has set forth four potential bases for its claim. The first asserts that the defendants wrongfully encroached on business originating in FWS's "exclusive" territory. The second asserts that the defendants improperly eliminated portions of FWS's trading area through the 2007 amendment to the MAA. The third asserts that the defendants improperly terminated their business relationship with FWS without cause and without providing an opportunity to cure any default. The fourth asserts a breach of the implied duty of good faith and fair dealing. *See* Am. Compl., Count II. The contractual provisions on which FWS relies are found only in the RWSC Agreement between FWS and Service Center, a contract to which the defendants were never a party and that expired by its own terms in June 2002, prior to any of the actions giving rise to this lawsuit. FWS argues that, even though the RWSC Agreement expired in 2002 and was between FWS and a third party (namely, Service Center), the conduct of Walls and EVN in continuing to do business with FWS from 2003 through 2008 evidenced an implied-in-fact contract on the same terms as the expired RWSC Agreement. I disagree.

Under Connecticut law, the "elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Seligson v. Brower*, 109 Conn. App. 749, 753 (2008) (internal quotation marks omitted). An implied-in-fact contract is the same as an express contract, except that assent is

not expressed in words, but is implied from the conduct of the parties. *Janusauskas v. Fichman*, 264 Conn. 796, 804 (2003).

> The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence. . . . To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists. . . . So long as any essential matters are left open for further consideration, the contract is not complete.

*L&R Realty v. Conn. Nat'l Bank*, 53 Conn. App. 524, 534-35 (1999) (quotations and citations omitted).

Here, there is no need to reach the issue of breach or damages because plaintiff's claim fails at the threshold: FWS has not shown that the parties' business relationship from 2003 through 2008 gave rise to an implied-in-fact contract that incorporated the specific terms of the previous RWSC Agreement. In the absence of any operative contractual rights to an exclusive territory or termination privileges, FWS cannot sustain a breach of contract claim based on the defendants' conduct here. There is simply no breach of contract where no enforceable contract exists.

First, the RWSC Agreement expired by its own terms in June 2002, prior to any of the actions that gave rise to this controversy. Under section 8.1, FWS and Service Center agreed to "continue this Agreement for a period beginning June 1, 1999 and continuing through June 3, 2002, unless terminated under the provisions set forth in Section 9." Pl.'s Ex. 5, at 5. Moreover, section 13 stated: "No change or modifications of this Agreement shall be valid unless it is in writing and signed by both parties." *Id.* at 7. FWS and Service Center never agreed in writing to modify or extend the term of the contract.

FWS argues that, because it continued to do business with Service Center after June

2002, the parties to the RWSC Agreement mutually assented to a new, ongoing contract containing all the same provisions from the expired agreement. *See Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946) ("When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old. Ordinarily, the existence of such a new contract is determined by the 'objective' test, i.e., whether a reasonable man would think the parties intended to make such a new binding agreement- whether they acted as if they so intended."). I am not persuaded that the parties' actions here, looked at objectively, manifested any such intent. The original RWSC Agreement specifically stated that "[n]o change or modifications of this Agreement shall be valid unless it is in writing" and no written modification was ever executed. The absence of any written agreement extending the expiration date, coupled with section 13's provision barring modifications unless in writing, negates any implication that FWS and Service Center mutually assented to a new contract containing the same provisions as the old when they continued to do business after June 2002. *See Conntect, Inc. v. Turbotect, Ltd.*, 1998 WL 91067, at *5 (D. Conn. Feb. 23, 1998) (refusing to find that the terms of an expired written contract continued to govern by implication the parties' subsequent business relationship when the original contract included a clause barring modification unless in writing). The language of the RWSC Agreement is clear that the parties intended that the agreement would expire on June 3, 2002 unless extended in writing. There was never a written extension or renewal of the agreement. Thus, the RWSC Agreement had already expired many months before defendants Walls and EVN took over Service Center's role under the MAA in March 2003. *See* Pl.'s Ex. 2.

Second, even if the RWSC Agreement was extended by implication beyond June 2002,

that contract was between FWS and *Service Center*, not either of the defendants. Neither Walls nor EVN was ever a party to that agreement. Thus, they could not have "continued" to do business with FWS as they had under the written agreement. Any promises exchanged between FWS and Service Center regarding the purported exclusive trading territories or termination privileges could not bind third-parties such as Walls and EVN without their assent. *See Bender v. Bender*, 292 Conn. 696, 728 (2009) ("Under well established contract law, a contract must be definite and certain as to its terms and requirements. In addition, there must be a manifestation of mutual assent to those terms and requirements.") (internal citations omitted). FWS has failed to make any showing that Walls or EVN manifested any intent to be bound by any of the specific terms of the former RWSC Agreement between FWS and Service Center. Moreover, FWS has failed to show it provided any additional consideration to support extending the terms of the expired RWSC Agreement to govern its relationship with the defendants. At most, FWS has shown that Walls and EVN permitted FWS to do business in HMI products from 2003 through 2008 and accepted license fees in return, fees that defendants forwarded to HMI. That on-going business relationship did not create an implied contract incorporating the specific exclusivity and termination provisions from an expired contract with an unrelated party, provisions upon which the entirety of plaintiff's claim relies. There is simply no evidence that the expired RWSC Agreement between FWS and Service Center was somehow transferred to the defendants and became a legally binding obligation. Thus, the defendants actions from 2003 through 2008, including servicing customers in FWS's alleged "exclusive" territory, decreasing FWS's trading area by amending the MAA, and terminating the business relationship, did not contravene any express or implied agreement between the parties. In the absence of an operative contract, there can be no breach and FWS's claim fails.

Lastly, although the argument was never raised explicitly, it bears mentioning that FWS cannot claim any enforceable rights to an exclusive trading territory as a third-party beneficiary of the original MAA between HMI and Service Center or any subsequent MAA amendments involving Walls and EVN. "The law regarding the creation of contract rights in third parties in Connecticut is . . . well settled . . . . The ultimate test to be applied [in determining whether a person has a right of action as a third-party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." *Dow & Condon, Inc. v. Brookfield Dev. Corp.*, 266 Conn. 572, 580-81 (2003) (some alterations in original; internal quotation marks omitted). Here, nothing in the MAA or any of its amendments evidences any intent to confer contractual rights on third-parties such as FWS or any other RWSC. Instead, the MAA simply granted Service Center (and later Walls and EVN) a license to use HMI products and marks, as well as the power to grant sublicenses to individual RWSCs. *See* Def.'s Ex. A, at 1-2. HMI reserved the right to "review and approve the organizations selected as [RWSCs]," and a list of "authorized" RWSCs and their "areas of coverage" was attached as Exhibit B to the MAA. *See id.* at 2, 14 (Exhibit B). However, the MAA makes no mention of conferring an "exclusive" trading territory on any individual RWSC, nor is there any provision providing the RWSCs with termination privileges or any other enforceable rights. Although section 2.2 provides that any "proposed changes or additions to the group of authorized [RWSCs], their location, their ownership, or their respective market area coverage" must be submitted to HMI for approval at least 60 days in advance, that provision merely reinforces HMI's right to police its marks and does not evidence any intent to confer rights on third-party RWSCs. In the

absence of that intent, FWS cannot support its claims even under a third-party beneficiary theory.

## III. Conclusion

FWS has failed to show by a preponderance of the evidence that an implied contract existed with the defendants at any time, and therefore cannot make out a claim for its breach. For this reason, defendants' motion for judgment pursuant to Fed. R. Civ. P. 52(c) is GRANTED. The clerk shall enter judgment and close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 8th day of November 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge